UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

JOSEPH J. SCATURRO,

Plaintiff,

vs.

SEMINOLE CASUALTY INSURANCE
COMPANY; and CARL N. SEAMAN,

Defendants.



**07-61072**

**CIV - HUCK**   MAGISTRATE JUDGE
SIMONTON

FILED by _____ D.C.
INTAKE

AUG - 1 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. • FT. LAUD.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Joseph J. Scaturro, by and through his undersigned counsel, for his Complaint

against Defendants Seminole Casualty Insurance Company and Carl N. Seaman alleges as

follows:

### PARTIES

1.      Plaintiff is an individual residing in the State of Florida, County of Broward.

2.      Defendant Seminole Casualty Insurance Company ("Seminole" or "the

company") is a Florida corporation with its principal place of business in the State of Florida,

County of Broward.

3.      Defendant Carl N. Seaman ("Seaman") is an individual residing in the State of

Connecticut, County of Fairfield.  Defendant Seaman is the majority shareholder and Chairman

of the Board of Directors of Defendant Seminole.

### JURISDICTION AND VENUE

4.      This Court has original subject-matter jurisdiction over this action under 28

U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because it includes claims

under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-b). The Court has pendent jurisdiction over Plaintiff's state court claims under 28 U.S.C. § 1367(a).

5.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant Seminole transacts business and maintains its principal place of business in this District, and under Section 27 of the Exchange Act because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS COMMON TO ALL COUNTS

### PLAINTIFF'S EMPLOYMENT WITH SEMINOLE

6.     Plaintiff is one of two shareholders in Defendant Seminole, owning 20% of its outstanding stock.

7.     Between on or about May 7, 2002 and on or about May 14, 2007, Plaintiff was employed by Defendant Seminole, most recently holding the position of President, and served as a member of its Board of Directors.

8.     At all times from on or about May 7, 2002 to the date hereof, Plaintiff has suffered from visual impairment, namely, complete blindness and lack of peripheral vision in the right eye resulting from a damaged cornea, and significantly diminished vision in the left eye resulting from cataracts. Plaintiff's visual impairment renders it difficult for him to read and often requires that he depend upon third parties to read and explain the contents of documents to him.

9.     Defendant Seminole is engaged in the business of writing insurance policies, primarily for automobiles, and primarily in the State of Florida.

MALMAN, MALMAN & ROSENTHAL ◆ 3107 STIRLING ROAD, SUITE 101 ◆ FORT LAUDERDALE, FLORIDA 33312-8500 ◆ (954) 322-0065

10.     Defendant Seaman is one of two shareholders in Defendant Seminole, owning 80% of its outstanding stock, and serves as the Chairman of its Board of Directors.

11.     Upon information and belief, at all times between May 2002 and the date hereof, Defendant Seaman, through his controlling ownership interest in the company, his ability to nominate and elect directors and his ability to approve corporate action, controlled Defendant Seminole.

12.     At all times between May 2002 and the date hereof, Defendant Seminole and its directors, officers and employees, including Defendant Seaman, were aware of Plaintiff's visual impairment and the limitations it placed upon his ability to read documents, and routinely assisted Plaintiff in reading documents in the course of his employment.

13.     Prior to May 2002, Defendant Seminole was unprofitable and significantly underreserved.

14.     In May 2002, Defendant Seaman, in his capacity as Chairman and, at the time, sole shareholder of Defendant Seminole, recruited Plaintiff, an experienced insurance executive with approximately 40 years of significant industry experience, in the Southern District of Florida to manage the Florida operations of Defendant Seminole, turn it around and increase its profitability and share value.

15.     As compensation for his employment with the company, Defendant Seaman orally offered Plaintiff: a) a base salary of $160,000; b) an annual bonus calculated at 30% of the amount by which Plaintiff succeeded in reducing the expenses of Defendant Seminole; c) continuous ongoing employment until Plaintiff, who, at the time, was 58 years old, either retired or the company was sold, provided that Plaintiff was successful in turning the company around;

and d) payments to Plaintiff's wife for a minimum of two years following Plaintiff's death, if he were to die before retiring or the company being sold.

16.     As a result of representations Defendant Seaman made to him, Plaintiff accepted employment with Defendant Seminole on these terms.

17.     After accepting employment with Defendant Seminole, Plaintiff determined that he required an additional experienced insurance executive to successfully turn the company around and requested that Defendant Seminole hire Robert Fenimore as a sales executive.

18.     In response to this request, Defendant Seaman told Plaintiff that the company could not afford to hire Mr. Fenimore.

19.     In order to reach the goals set for Defendant Seminole and earn his bonus, Plaintiff made it possible for the company to hire Mr. Fenimore by splitting his base salary with Mr. Fenimore on a 50/50 basis.

### PLAINTIFF'S ACQUISITION OF A MINORITY INTEREST IN DEFENDANT SEMINOLE

20.     By 2003, Plaintiff had significantly reduced Defendant Seminole's expenses, and, under the original oral employment agreement, was entitled to a bonus of approximately $600,000.00.

21.     When Plaintiff asked Defendant Seaman to pay him his bonus, Defendant Seaman refused, urging Plaintiff to forgo the bonus, and, instead, to purchase shares in Defendant Seminole.

22.     Plaintiff, who had already forgone more than $80,000.00 of his salary, was reluctant to make cash payments for shares in Defendant Seminole, which, at the time, remained unprofitable and relatively worthless.

23.     Plaintiff explained this to Defendant Seaman, who continued to urge Plaintiff to buy shares in the company.

24.     Defendant Seaman eventually told Plaintiff that he would not be required to reach into his own pocket to buy the shares: If, instead, Plaintiff agreed to forego his $600,000.00 bonus, he would receive bonuses for 2002, 2003, 2004, 2005 and 2006 and these bonuses would be applied to pay for shares in the company.

25.     Defendant Seaman also promised Plaintiff that he would receive a substantial return on his investment once Defendant Seminole was successfully turned around and sold.

26.     Plaintiff reasonably relied upon these representations in agreeing to forego the $600,000.00 bonus and apply portions of bonuses from 2002, 2003, 2004, 2005 and 2006 to pay for shares in Defendant Seminole.

27.     Plaintiff ultimately purchased 400,000 shares of the company at $0.65 per share, for a total of $260,000.00.

## EXECUTION OF THE SHAREHOLDERS' AGREEMENT

28.     After Plaintiff had forgone his $600,000.00 bonus and purchased shares in the company, Defendant Seaman, in both his personal capacity and his capacity as Chairman of the company, retained his cousin, Melvyn H. Halper, a real estate attorney practicing in New York, to draft a shareholders' agreement (the "Shareholders' Agreement"), which Defendant Seaman presented to Plaintiff at some point in 2004.

29.     Plaintiff requested that Defendant Seaman, as both the Chairman of Defendant Seminole and its majority shareholder, explain the material terms of the Shareholders' Agreement to him.

30. In response, Defendant Seaman stated, "It's what we've talked about. It's the stock that you'll cash out when we sell the company. Trust me, Joe. I love you and your wife, and I'm going to take care of you."

31. In reliance upon this representation, which was consistent with their previous oral agreements about the stock, Plaintiff executed the Shareholders' Agreement, returned the Agreement to Defendants, and paid a total of $260,000.00 for the shares.

32. Specifically, Plaintiff paid $104,000.00 in cash and executed a note for $156,000.00, which he subsequently repaid through annual payments of $52,000.00 made in January 2005, January 2006 and January 2007.

33. Section 7 of the Shareholders' Agreement specifically recites that Plaintiff was advised by Mr. Halper that there was a conflict between Plaintiff, Defendant Seminole and Defendant Seaman, and that he should retain separate counsel.

34. In fact, Plaintiff never received this, or any other advice, from Mr. Halper or any other party.

35. In addition, Mr. Halper never advised Plaintiff that Mr. Halper only represented Defendant Seminole and its controlling shareholder, Defendant Seaman, and that, accordingly, the agreement was specifically drafted to promote Defendants Seminole's and Seaman's interests.

## PLAINTIFF SUCCESSFULLY TURNED THE COMPANY AROUND

36. Between May 2002 and early 2007, Plaintiff successfully turned Defendant Seminole around, leading it from the verge of insolvency and receivership, to profitability, substantial reserves and operations presently in the midst of expanding into multiple states: significant benchmarks documenting the company's improvement under Plaintiff's leadership

include almost tripling its total assets and tripling its total surplus between 2001 and 2005. Annexed hereto as Exhibit A is a current page from Defendant Seminole's website, touting Plaintiff's success as the company's President, and the company's growth under his leadership. Annexed hereto as Exhibit B is Standard & Poor's Insurer Profile for the company, setting forth data concerning its growth in assets and surplus between 2001 and 2005.

37.    Between May 2002 and early 2007, Defendant Seaman regularly called Plaintiff in Florida and traveled to Florida every four to six weeks to discuss the company's status with Plaintiff.

38.    During these conversations, they also discussed selling Defendant Seminole, agreeing that the sale proceeds would be split between them 80/20, according to their respective ownership interests in the company.

## TERMINATION OF PLAINTIFF'S EMPLOYMENT

39.    On or about May 11, 2007, Defendant Seminole terminated Plaintiff, without notice or explanation.

40.    Plaintiff subsequently received a June 20, 2007 letter from Defendant Seaman stating that Defendant Seaman sought to exercise his call rights under the Shareholders' Agreement, and enclosing a copy of the Agreement. A copy of the letter and Agreement are annexed hereto as Exhibits C and D, respectively.

41.    The forwarded Agreement had a separate page labeled "Schedule B" attached to it, which provides, in significant part:

> Notwithstanding the forgoing, the price per [share] as of the Exercise Date shall be (i) $.65 per share if during the period beginning on the date of this Agreement and ending January 1, 2008, the Executive Shareholder voluntarily terminates his employment or his employment is involuntarily terminated by the Corporation for any reason.

42.     Defendant Seaman never discussed Schedule B with Plaintiff when Plaintiff asked Defendant Seaman to read him the Agreement.  At the time Plaintiff signed the Agreement, relying on Defendant Seaman's representations as to the contents thereof, Plaintiff had no idea that it contained any provisions such as those included in Schedule B.  At no time from Plaintiff's execution of the Agreement until his receipt of Defendant Seaman's June 20, 2007 letter was Plaintiff ever aware of the existence of Schedule B; it was never mentioned to him by Defendant Seaman, nor were its terms ever discussed.

43.     Schedule B does not contain a signature or initials to indicate that it was included with the Agreement when the Agreement was originally presented to Plaintiff.

44.     In addition, this provision directly conflicts with Defendant Seaman's representation to Plaintiff concerning the Agreement, when he stated, "It's what we've talked about.  It's the stock that you'll cash out when we sell the company."

45.     Plaintiff would not have purchased the shares nor executed the Agreement if he had known at the time that he did so that he could later be forced to sell his shares at the price at which they had been purchased.

## COUNT 1 - SECURITIES FRAUD UNDER SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 THEREUNDER
(Against Defendants Seminole and Seaman)

46.     Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 45 of the Complaint, as though fully set forth herein.

47.     In both of his roles as Chairman of Defendant Seminole and its majority shareholder, Defendant Seaman made misrepresentations and omissions to persuade Plaintiff to purchase a minority interest in the company.  These misrepresentations and omissions include:

A.  Defendant Seaman specifically misrepresenting the content of the Shareholders' Agreement ("It's what we've talked about. It's the stock that you'll cash out when we sell the company"), when asked by Plaintiff, who is completely blind in one eye and has significantly diminished vision in the other, to explain its contents to him;

B.  Defendant Seaman representing to Plaintiff that Plaintiff would be employed by Defendant Seminole until he retired or the company was sold, when Defendant Seaman knew that he would terminate Plaintiff prior to January 1, 2008 to seek to force the sale of Plaintiff's shares for far less than their fair market value; and

C.  Defendant Seaman representing to Plaintiff that, in the event that Defendant Seminole were to be sold, Plaintiff would share in the proceeds of that sale in accordance with his ownership interest in the company, when Defendant Seaman knew that he would terminate Plaintiff prior to January 1, 2008 to seek to force the sale of Plaintiff's shares for far less than their fair market value and thereby preclude Plaintiff from sharing in the potentially substantial proceeds of the company's sale.

48.  Defendant Seaman made these misrepresentations and omissions in order to persuade Plaintiff to purchase shares in the company, and Plaintiff relied upon these misrepresentations and omissions in doing so.

49.  Plaintiff's reliance was reasonable because he routinely depended upon his fellow employees, officers and directors of Defendant Seminole to read and/or summarize written agreements for him, and had no reason to suspect that Defendant Seaman would fraudulently induce his purchase of these shares, particularly since, at the time of the purchase and thereafter, Defendant Seaman repeatedly voiced his satisfaction in the job that Plaintiff was doing at the company.

50.  Defendant Seaman's misrepresentations and omissions were made in connection with both Plaintiff's purchase of securities in Defendant Seminole and the proposed forced sale of Plaintiff's securities in Defendant Seminole by Defendant Seaman.

51.     Plaintiff did not become aware of these misrepresentations and omissions until he received the June 20, 2007 letter, which included a copy of Schedule B, and demanded that he sell his shares to Defendant Seaman for $.65 per share.

52.     As the direct and proximate result of Defendant Seaman's misrepresentations and omissions, Plaintiff has sustained damages, including:  failing to obtain fair market value for his shares, which is believed to be a minimum of several million dollars, or, indeed, any return on his investment, notwithstanding both his significant labor and success in turning the company around, and his forgoing more than $1 million in bonuses to which he would have otherwise been entitled.

## COUNT 2 – BREACH OF ORAL EMPLOYMENT CONTRACT
### (Against Defendant Seminole)

53.     Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 45 of the Complaint, as though fully set forth herein.

54.     Defendant Seaman, acting on behalf of Defendant Seminole, offered Plaintiff employment with the company.

55.     According to the terms of the employment offer, Plaintiff was to have continuous ongoing employment until he either retired or the company was sold, provided that he was successful in turning the company around.

56.     Plaintiff has been successful in turning the company around; between 2001 and 2005, the company had almost tripled its total assets and had tripled its total surplus.

57.     Plaintiff has, nevertheless, been terminated prior to his retirement or the sale of the company, thereby resulting in a breach of the employment agreement.

58.     Plaintiff relied upon his continuous ongoing employment with the company in deciding to purchase a minority interest in it.

59.    As the direct and proximate result of the breach of his employment agreement, Plaintiff has sustained damages, including: losing the benefits of his employment, such as his annual salary, periodic bonuses and other work-related benefits; and failing to obtain fair market value for his shares, which is believed to be a minimum of several million dollars, or, indeed, any return on his investment, notwithstanding both his significant labor and success in turning the company around, and his forgoing more than $1 million in bonuses to which he would have otherwise been entitled.

### COUNT 3 – BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING
(Against Defendant Seminole)

60.    Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 45 of the Complaint, as though fully set forth herein.

61.    Plaintiff's employment agreement includes an implied covenant of good faith and fair dealing.

62.    Defendant Seaman, acting as the Chairman of Defendant Seminole, terminated Plaintiff's employment so that Defendant Seaman could attempt to force the sale of Plaintiff's shares to either himself or the company, at Defendant Seaman's election, for a price that would be significantly below the fair market value of these shares.

63.    Plaintiff was terminated in bad faith, and, thus, Defendant Seminole breached the implied covenant of good faith and fair dealing.

64.    As the direct and proximate result of Defendant Seminole's breach of the implied covenant of good faith and fair dealing, Plaintiff has sustained damages, including:  losing the benefits of his employment, such as his annual salary, periodic bonuses and other work-related benefits; and failing to obtain fair market value for his shares, which is believed to be a minimum

of several million dollars, or, indeed, any return on his investment, notwithstanding both his significant labor and success in turning the company around, and his forgoing more than $1 million in bonuses to which he would have otherwise been entitled.

## COUNT 4 – BREACH OF FIDUCIARY DUTY
(Against Defendant Seaman)

65.     Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 45 of the Complaint, as though fully set forth herein.

66.     As a result of their respective roles as majority and minority shareholders in the company, Defendant Seaman owed Plaintiff a fiduciary duty.

67.     Defendant Seaman breached his fiduciary duty by:

A.      deliberately failing to disclose to Plaintiff the terms of the Shareholders' Agreement, with the expectation and intention that the terms would never be discovered as a result of Plaintiff's significant visual impairment;

B.      lying to Plaintiff about the content of the Shareholders' Agreement when specifically asked to explain its content;

C.      failing to disclose to Plaintiff that the attorney who drafted the Shareholders' Agreement was acting solely on behalf of Defendants Seaman and Seminole, and was not acting on behalf of Plaintiff as well;

D.      fraudulently inducing Plaintiff to buy stock in Defendant Seminole with the promise that, based upon Plaintiff's 20% stock ownership, he would receive 20% of the proceeds of a successful sale of the company, when Defendant Seaman did not intend to keep this promise;

E.      repeatedly promising Plaintiff that he would be employed by Defendant Seminole until Plaintiff's retirement or the sale of company, and then terminating him to prevent him from obtaining fair market value for his shares; and

F.      demanding that Plaintiff sell his shares for far less than their fair market value.

68.     As the direct and proximate result of Defendant Seaman's breach of fiduciary duty, Plaintiff has sustained damages, including: losing the benefits of his employment, such as his annual salary, periodic bonuses and other work-related benefits; and failing to obtain fair

market value for his shares, which is believed to be a minimum of several million dollars, or, indeed, any return on his investment, notwithstanding both his significant labor and success in turning the company around, and his forgoing more than $1 million in bonuses to which he would have otherwise been entitled.

### COUNT 5 - FRAUDULENT INDUCEMENT
(Against Defendant Seminole and Defendant Seaman)

69.    Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 though 45 of the Complaint, as though fully set forth herein.

70.    In both of his roles, as Chairman of Defendant Seminole and its majority shareholder, Defendant Seaman encouraged Plaintiff to purchase shares in Defendant Seminole by representing that he would receive a substantial return on his investment once the company was turned around and sold.

71.    Defendant Seaman intended that this representation would induce Plaintiff turn the company a round, promote the company's sale, and pur chase a minority interest in the company, and this representation was material to, and replied upon, by Plaintiff in deciding to do all three.

72.    At the time that Defendant Seaman made this representation, he knew that it was false; he knew that, once the company was turned around, he would terminate Plaintiff and demand that Plaintiff sell his shares in the company for far less than their fair market value.

73.    As the direct and proximate result of Defendant Seaman's fraudulent inducement, Plaintiff has sustained damages, including:  losing the benefits of his employment, such as his annual salary, periodic bonuses and other work-related benefits; and failing to obtain fair market value for his shares, which is believed to be a minimum of several million dollars, or, indeed, any return on his investment, notwithstanding both his significant labor and success in turning

the company around, and his forgoing more than $1 million in bonuses to which he would have otherwise been entitled.

## COUNT 6 – DISSOLUTION
### (Against Defendant Seminole)

74.    Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 45 of the Complaint, as though fully set forth herein.

75.    Defendant Seminole has two shareholders; Plaintiff and Defendant Seaman.

76.    At all times relevant to this Complaint, Defendant Seaman, through his controlling ownership interest in Defendant Seminole, his ability to nominate and elect directors and his ability to approve corporate action, has controlled and continues to control the company.

77.    Defendant Seaman has acted, is acting, and is reasonably expected to act in a manner that is illegal and fraudulent toward Plaintiff.

78.    In particular, Defendant Seaman has caused Defendant Seminole to breach its employment agreement with Plaintiff, and seeks to force the sale of Plaintiff's shares for far less than their fair market value.

79.    Under Florida Statute section 607.1430, Seminole may be dissolved.

80.    In the alternative, under Florida Statute section 607.1436, the Court may:   1) appoint a receiver, custodian *pendente lite* or provisional director; 2) order that Plaintiff's shares in the company be purchased for their fair market value; or 3) grant any equitable relief that the Court deems appropriate.

81.    Plaintiff respectfully requests that the Court grant such relief as it believes appropriate.

## COUNT 7 – ATTORNEYS' FEES
(Against Defendant Seminole)

82.     Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 45 of the Complaint, as though fully set forth herein.

83.     At all times relevant to this Complaint, Defendant Seaman, through his controlling ownership interest in Defendant Seminole, his ability to nominate and elect directors and his ability to approve corporate action, has controlled and continues to control the company.

84.     Defendant Seaman has acted, is acting, and is reasonably expected to act in a manner that is illegal and fraudulent toward Plaintiff.

85.     In particular, Defendant Seaman has caused Defendant Seminole to breach its employment agreement with Plaintiff, and seeks to force the sale of Plaintiff's shares for far less than their fair market value.

86.     Under Florida Statute section 607.1430, Defendant Seminole may be dissolved.

92.     Under Florida Statute section 607.1436, Plaintiff is entitled, in the Court's discretion, to an award of reasonable attorneys' fees and expenses incurred in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against the Defendants:

1.      On Plaintiff's First, Second, Third, Fourth and Fifth Counts, awarding compensatory, consequential and punitive damages in an amount to be determined at trial;

2.      On Plaintiff's Sixth Count, dissolving Defendant Seminole, appointing a receiver, custodian pendente lite, or provisional director, ordering that Plaintiff's shares in Defendant Seminole be purchased for their fair market value, or granting any equitable relief that the Court deems appropriate; and

3.      Awarding attorneys' fees, costs, expenses, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: Fort Lauderdale, Florida
        July 31, 2007

Respectfully submitted,

Malman, Malman & Rosenthal
3107 Stirling Road
Suite 101
Fort Lauderdale, Florida 33312-8500
Tel. 954-322-0065
Fax. 954-322-0064
Email: jrosenthal@bellsouth.net

By: _____
        Jonathan H. Rosenthal
        Florida Bar No. 126764

ROSNER & NAPIERALA, LLP
Brian Rosner (BR-4306)
26 Broadway, 22nd Floor
New York, NY 10004-1808
Telephone:  (212) 785-2577
Facsimile:  (212) 785-5203

Attorneys for Joseph J. Scaturro

Our Company                                                                http://www.seminoleinsurance.com/Info/AboutUs.aspx

 

Seminole Home  |  Our Company  |  Our Products  |  News  |  Claims Service  |  Contact Us

Seminole Casualty Insurance Company began writing personal auto insurance policies in Florida in 1989. Since that time, over the past 16 years, a steady growth rate in writings has been established. Through the 1990's and the uniquely competitive auto liability market Seminole maintained its ability to weather the storms of not only competition but market forces and changes.

In May, 2002 the company founder brought to Seminole an insurance professional to lead Seminole at a time when the market saw several carriers placed into liquidation and rehabilitation. That individual, the current company President brought his visions and forty years of industry experience to Seminole. His first tasks were to revitalize and reorganize the underwriting department and he spear-headed major revisions to the company underwriting manual, rates and policy matters. Recognizing that underwriting plays hand-in-hand with marketing and an agency force our President began a review of all agents and retained those whose philosophy tended to mirror his own. With the assistance of our marketing director, a strong agency force has been assembled.

Turning his attention to claims and the claims department the President brought to Seminole a person with over thirty years of claims experience as Claims Manager. Several experienced claims adjusters, litigation adjusters and other professionals were enlisted to bring the Company to where it is today, a profitable entity with a surplus in excess of $12 million dollars and still growing.

With the new and enlightened claims department in place Seminole reduced outstanding litigation files from a high of over 700 to as few as 14 through skilled negotiations and settlements. Today, we are proud of all of the accomplishments in creating and building an insurance entity that is poised to continue its steady growth, in a mature, skillfully handled manner. Moreover, customer service is at an all time high with calls being returned promptly, adjusters handling claims in a timely manner and an Underwriting Department that is capable and responsive to the needs of our agents and customers.

As evidence of our stability and strength, in September, 2004, the company was granted a license in the State of Maryland and began writing personal auto coverage. That program, administered by a Third Party Administrator on our behalf, after one year, is projected to also be a profitable market and a new, vital addition to the Seminole Casualty family.

In December, 2005 our Florida charter was extended to permit writings in nearly all lines. In April, 2006 we will begin writing business in the State of Tennessee. We are looking forward to our continued growth and our ever increasing family of agents. Toward our goal of being a major force in the insurance industry, Seminole Casualty Insurance Company has made application for licensure in New York, Pennsylvania, Georgia, California, Nevada and Alabama.

With a top-notch management team firmly in place we believe that the next three years will be banner years at Seminole serving the Florida market and its consumers as well as the programs being written in other States. Today, Seminole Casualty Insurance Company is a company that stands upon its own and builds upon past successes one day and one quarter at a time. Our 2003 and 2004 Annual Reports and our most recent Third Quarter, 2005 financial reports are clear and convincing evidence of not only positive, but healthy, growth of the past three years and are excellent indicators of the company's ability to thrive and weather the changes in markets or nature.

We are looking forward to the second half of this first great decade of the new millennium with excitement and an air of excellence. Our foundation is strong and our resolve is solidly placed upon our past successes and we are poised accomplish all that we choose.

**Back to Top**



Standard & Poor's

# Insurer Profile
The Source For Informed Financial Decision-Making

|  |
|---|
| **NR**<br>Not Rated |

**Seminole Casualty Insurance Co.**
PO Box 9512
Lake Worth FL 33466-9512
(561)-515-2500
*NAIC:* 33545
*Financial Strength Rating:* NR
*Parent:* (none)
*Insurer Profile dated July 31, 2007*

### Five-year Ratings History

| | |
|---|---|
| 01/01/2006 | NR |
| 01/01/2005 | NR |
| 01/01/2004 | NR |
| 01/01/2003 | Bpi |
| 01/01/2002 | Bpi |

### 2005 Major Lines of Business (%) *

| | |
|---|---|
| Private Passenger Auto Liability | 78.2 |
| Auto Physical Damage | 21.8 |

### 2005 Five Largest States (%) *

| | |
|---|---|
| Florida | 87.3 |
| Maryland | 12.7 |

### 2005 Licensed States

FL, TN

### Five-year financial information

| | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| Total Assets | 38 | 28 | 21 | 16 | 13 |
| Loss Reserves | 6 | 6 | 5 | 6 | 4 |
| Total Surplus | 12 | 9 | 7 | 4 | 3 |
| Net Premium Written | 31 | 23 | 15 | 12 | 13 |
| After-Tax Earnings | 3 | 3 | 1 | -2 | -1 |
| | | | | | |
| Return on Revenue (%) | 18.0 | 12.0 | 5.9 | -19.1 | -8.5 |
| Return on Surplus (%) | 32.3 | 35.6 | 22.9 | -63.4 | -35.2 |
| Loss Ratio (%) | 56.5 | 65.6 | 79.8 | 93.4 | 87.5 |
| Expense Ratio (%) | 22.7 | 21.8 | 15.8 | 28.8 | 24.6 |



EXHIBIT
B

| | | | | | |
|---|---|---|---|---|---|
| Combined Ratio (After Dividends) (%) | 79.2 | 87.5 | 95.6 | 122.2 | 112.1 |
| Net Investment Income / NPE (%) | 2.5 | 2.7 | 4.4 | 4.8 | 5.2 |
| NAIC Risk-Based Capital (%) | 376.9 | 337.9 | 464.7 | 212.5 | 228.3 |

*\* Percentage sums greater than 100% are due to negative premiums.*

*All statutory data ($Mil) provided by National Association of Insurance Commissioners, with permission.*

## The Standard & Poor's Team: Experienced, Comprehensive, Global

Standard & Poor's traces its history back to 1860. Today, it is acknowledged as the global financial benchmark whose financial ratings, analysis and information help people throughout the world make well-informed financial decisions. Since 1971, Standard & Poor's has been rating the financial strength of insurers. This includes life insurers, annuity companies, property and casualty insurers, title, mortgage and bond insurers, reinsurers, as well as healthcare plans like HMOs. Standard & Poor's insurance rating services employs specialized financial analysts around the world who regularly report on the financial strength of thousands insurers and reinsurers worldwide.

Standard & Poor's insurance analysts have had many years of training and experience, analyzing domestic and foreign insurance companies, large and small, in many different lines of business, thus making Standard & Poor's a unique source of analytical insight. Added to these strengths in insurance financial analysis is another Standard & Poor's advantage — our Ratings Services include other specialized groups that analyze and rate banks, mutual funds, industrial corporations, municipalities and sovereign governments, as well as the complex financing instruments available in today's dynamic markets. Standard & Poor's thus can call upon these powerful resources to support its analysis of the complex organizations evolving today in the business of insurance, pensions and healthcare.

Given the depth and sophistication of Standard & Poor's analyses consumers, corporate risk managers, pension and employee benefit managers, as well as insurance brokers, agents and commercial bankers, recognize and value Standard & Poor's insure financial strength ratings.

## Why Standard & Poor's Insurance Ratings Are Important To You

Buying the right insurance products is a major challenge and an important part of your financial future. The financial strength of the insurer is often the most important part of this decision. That's

why it's vital to check the insurer's Standard & Poor's financial strength rating. Naturally, you also should consider the scope and terms of coverage, the quality of customer service and, of course, the price and benefits of the policy.

## The Ratings Explained

Standard & Poor's ratings represent our opinions about the financial strength of thousands insurers around the globe. If you ar a policyholder or are considering buying insurance products, these ratings help you make informed decisions about an insurer's financial strength.

The Standard & Poor's Security Circle Icons are assigned only to insurers which voluntarily submit to Standard & Poor's most rigorous review and subsequently achieve a rating in one of the top four categories for financial strength.

This extensive review includes interviews by Standard & Poor's analysts with the company's management, providing a solid understanding of the insurer's current and future operational and financial condition. Further, Security Circle insurers also have agreed to cooperate with Standard & Poor's ongoing monitoring of their financial condition. A plus (+) or minus (-) shows relative standing in a rating category.

---

DISCLAIMER: Ratings may change at any time.
Because of the possibility of human or mechanical error, Standard & Poor's does not guarantee the accuracy, adequacy, or completeness of any information contained in this Insurer Profile and is not responsible for any errors or omissions or for the results obtained from the use of such information. Standard & Poor's receives compensation for rating the financial strength of an insurer which is based on the insurer's size. The fees generally vary from $2,500 to $50,000. We reserve the right to disseminate our rating but receive no payment for doing so, except for subscriptions to our publications.

**Carl Seaman**
c/o Carl & Associates
250 Park Avenue, 20th Floor
New York, NY 10017

June 20, 2007

**Via Federal Express**
Mr. Joseph Scaturro
888 NW 115 Avenue
Plantation, FL 33325

Dear Mr. Scaturro:

Reference is made to the Agreement, dated January 2, 2004, by and among Seminole Casualty Insurance Company (the "Company"), me and you, dated January 2, 2004 (the "Agreement") pursuant to which I agreed to sell to you 400,000 shares of $1.00 par value common stock of the Company (the "Shares") pursuant to the terms and conditions of the Agreement.  A copy of the Agreement is attached hereto.

The purpose of this letter is to give notice to you of the exercise of my right, under Section 3 of the Agreement, to call all the Shares owned by you.  Pursuant to Section 3.1 of the Agreement, the purchase price for the Shares will be $.65 per share.  The closing with respect to the purchase and sale of the Shares shall be held at the offices of the Company, 6691 Nob Hill Road, Tamarac, FL 33321 on July 9, 2007 at 2P.M.

Very truly yours,

Carl Seaman



<u>AGREEMENT</u>

AGREEMENT, dated as of January 2, 2004, by and among Seminole Casualty Insurance Company, a Florida corporation (the "Corporation"), Carl Seaman (the "Other Shareholder") and Joseph Scaturro (the "Executive Shareholder").

WHEREAS, the authorized capital of the Corporation consists of 5,000,000 shares of $1.00 Par Value common stock, of which 2,000,000 have been issued and are outstanding (the "Shares"); and

WHEREAS, the Other Shareholder owns 2,000,000 Shares and desires to sell, and the Executive Shareholder desires to acquire, 400,000 Shares upon and subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.  <u>Issuance of Common Shares</u>.

1.1.     The Other Shareholder agrees to sell to the Executive Shareholder, and the Executive Shareholder agrees to purchase from the Other Shareholder, 400,000 Shares. The purchase price of the Shares shall be $260,000, payable $104,000 in cash simultaneously with the execution hereof and the balance of $156,000 by the delivery of a promissory note in the form of Schedule A attached. The Shares shall be restricted and shall be subject to repurchase as



provided in this Agreement. The Executive Shareholder hereby acknowledges that he has been given full access to all books and records of the Corporation in connection with his acquisition of the Shares, and that he has had ample opportunity to ask and have answered all his questions regarding the Corporation.

1.2.    The Other Shareholder shall executed the appropriate transfer documents with respect to the Shares sold to the Executive Shareholder and shall issue to the Executive Shareholder appropriate stock certificates, registered in such Executive Shareholder's name, evidencing the Shares acquired by him.

2.    Restriction on Transfer; Right of First Refusal; Encumbrances.

2.1.    The Executive Shareholder may not Transfer (which term shall mean sell, transfer, assign, grant an option or other purchase right in respect of or otherwise dispose of) any Shares during his employment with the Corporation except for (a) Transfers to the Corporation or to the Other Shareholder, or his assigns, (the Other Shareholder and his assigns are collectively referred to as the "Other Shareholder"), or (b) Transfers made pursuant Section 6 (regarding Rights and Obligations to Participate in the sale of Shares to a Third Party).

2.2.    Notwithstanding the provisions of Sections 2.1 hereof, the Shares held by the Executive Shareholder may at any time be Transferred to a Related Transferee (defined below) of the Executive Shareholder; provided, however, that prior to any such Transfer each Related Transferee shall first execute a written consent to be bound by all provisions of this Agreement and deliver an originally executed copy of such consent to the Corporation. The Related Transferee shall then receive and hold the Shares subject to the terms of this Agreement and the rights and obligations hereunder. There shall be no further Transfer of such Shares by a Related Transferee except between and among Related Transferees or except as otherwise permitted by this Agreement. For purposes of the call rights described in Section 3, below, the

-2-

death or termination of employment of the Executive Shareholder shall be deemed to be the death or termination of employment of his Related Transferees, if any. For purposes of this Agreement, "Related Transferee" means (a) the spouse and/or lineal descendants of such individual (or to a trust for any of their benefits), or (b) the estate of such individual.

2.3     After termination of employment of the Executive Shareholder ("Selling Shareholder") for any reason (including death) and upon the expiration of the call rights set forth in Section 3 below, the Executive Shareholder (or his estate, as the case may be) may Transfer some or all of the Shares then owned by him, provided that he gives written notice thereof (the "Transfer Notice") to the Other Shareholder and to the Corporation. In such event, the Corporation shall have the option, exercisable by written notice to the Selling Shareholder sent within 45 days after receipt of the Transfer Notice, to acquire the number of Shares so desired to be Transferred (the "Offered Shares") upon the same terms and at the same price per share as the terms and price per share specified in a bona fide offer from a prospective third party transferee to acquire the Offered Shares (which offer shall be described in the Transfer Notice, including the name and address of the offeror). If the Corporation does not desire to exercise such option in whole or in part, within 45 days after receipt of the Transfer Notice it shall assign the option or unexercised portion thereof to the Other Shareholder who shall be entitled to exercise, by written notice to the Selling Shareholder sent within 10 days after said assignment, such option or unexercised portion; provided, however, that such option shall not be exercisable unless the Corporation and/or the Other Shareholder shall exercise the option with respect to all Offered Shares. The closing with respect to an acquisition of Shares under this Section 2.3 shall be held as provided in Section 5.1 below. In the event that any offer proposes payment of some or all of the price offered for the Shares in property, other than cash, the Corporation or the other shareholders shall not be required to make payment in the form of such property but shall make payment in cash equal to the fair market value of the property identified in the Transfer Notice.

2.4     If the Corporation and/or the Other Shareholder do not exercise the option provided for in Section 2.3 above within the option period provided for therein, the Executive Shareholder shall have the right, at any time within 45 days after the expiration of such option period, to Transfer the Offered Shares to the offeror named, and upon the same terms and conditions contained in the Transfer Notice, provided that, upon such Transfer, the offeror and the Offered Shares shall be bound by and subject to all provisions of this Agreement and the offeror shall first execute a written consent to be bound by all provisions of this Agreement and deliver an originally executed copy of such consent to the Corporation. If the Offered Shares are not Transferred within such 45-day period, no Transfer of such Offered Shares shall be effected to the offeror or to any other third party without again following the procedures set forth in this Section 2.

2.5     Notwithstanding anything to the contrary herein contained, the Executive Shareholder agrees that, for so long as he owns any Shares, he shall not mortgage, pledge or otherwise encumber in any way any Shares owned by him.

2.6     To the extent the provisions of this Section 2 shall conflict or be inconsistent with any of the provisions of Section 3 below, the provisions of Section 3 shall have priority over and supersede the provisions of Section 2.

3.    Call Rights with Respect to Shares.

3.1.     In the case of termination of employment of the Executive Shareholder (including by reason of death), the Other Shareholder shall have the right to call and require the terminated Executive Shareholder (or his estate) to sell to the Other Shareholder all Shares owned by him on the date of termination, provided that said right shall not be exercisable later than six (6) months after the date of termination of employment. If the Other Shareholder does not exercise said call right for any reason or desires to exercise said right with respect to

less than all Shares owned by the terminated or deceased Executive Shareholder, the Other Shareholder shall notify the Corporation and the Corporation shall have the right, subject to Section 3.3 below, to call and require the terminated or deceased Executive Shareholder (or his estate) to sell to the Corporation all Shares owned by him on the date of termination (or the portion thereof not purchased by the Other Shareholder), provided that said right shall not be exercisable later than six (6) months after the date of termination of employment. The price per share with respect to any call hereunder shall be determined in accordance with Schedule B attached. Such price shall be payable as provided in Section 4 below at a closing as provided in Section 5.2 below.

        3.2.    <u>Notice of Exercise of Call Right</u>. The call rights under Section 3.1 above shall be exercised by notice in accordance with the notice provisions of Section 9 below.

        3.3.    <u>Limitation on Call Rights</u>. Notwithstanding anything to the contrary contained herein, expressed or implied, the call right of the Corporation under this Section 3 shall not be exercisable if (a) the Corporation is at such time, or if such exercise and consequent purchase of Shares by the Corporation shall cause the Corporation or any of its subsidiaries to be in default under any net worth, working capital or any other test or covenant relating to the financial condition or indebtedness of the Corporation, or any other covenant, contained in any bank or other loan or financing agreement (collectively "Loan Agreement") to which the Corporation or any of its subsidiaries is a party, (b) such exercise would result in the impairment of the Corporation's capital under the laws of the State of Florida, (c) the purchase by the Corporation of the Shares in question would violate or be prohibited by the terms of any Loan Agreement and the consent of the lender in question has not been obtained or (d) the purchase by the Corporation of the Shares in question would be prohibited or would result in an impairment of capital under the rules or regulations of any governmental agency, including, the rules of any insurance regulatory agency.   Notwithstanding the foregoing, the Other

Shareholder's call right under this Section 3 shall remain in full force and effect notwithstanding the existence of any limitation on the Corporation's exercise of its call right hereunder.

4.   Payment Upon Exercise of Call.   The purchase price payable by the Corporation and/or the other shareholders upon the exercise of a call under Section 3.1 hereof shall at the option of the Corporation or the Other Shareholder be paid in cash, by certified check or by wire transfer of immediately available funds, or in substantially equal installments over a period not to exceed five years at a closing held as provided in Section 5.2 below.  In the event that payment is to be made in installments, the first installment shall be made at the closing and each subsequent installment shall be made on the anniversaries thereof.

5.   Closing; Payment for Shares.

5.1.   A closing with respect to a purchase and sale of Shares pursuant to an exercise of a first refusal option under Section 2 above shall be held at the principal office of the Corporation (or at such other place as may be agreed upon by the Executive Shareholder and the purchaser or purchasers of such Shares) on a date and at a time designated by the purchaser or purchasers, but not later than (i) with respect to purchases by the Corporation alone, 60 days after the delivery to the Corporation and the Other Shareholder of the Transfer Notice, or (ii) with respect to purchases by the Other Shareholder (either alone or together with the Corporation), 20 days after the assignment by the Corporation to the Other Shareholder of the option to purchase said Shares.  At such closing there shall be delivered to the purchaser or purchasers a stock certificate or certificates representing all Offered Shares, duly endorsed in blank for transfer and with all applicable documentary and transfer tax stamps attached, paid or otherwise provided for by the seller of the Offered Shares, and the purchaser or purchasers shall pay the purchase price for the Offered Shares in the amount and in the manner set forth in the Transfer Notice, provided, however, if the Transfer Notice provides that all or any portion of the

-6-

purchase price shall be paid in property, other than cash, then the purchaser shall not be required to make payment in the form of such property, but may, at his or its election, make payment in cash in an amount equal to the fair market value of the property identified in the Transfer Notice.

5.2.    A closing with respect to a purchase and sale of Shares upon the exercise of a call under Section 3 above shall be held at the principal office of the Corporation (or at such other place as may be agreed upon by the Corporation and/or the Other Shareholder and the seller of such Shares) on a date and at a time designated by the Corporation and/or the Other Shareholder but not later than 60 days after notice of the exercise of such call shall have been delivered as provided in Section 9 below. At such closing there shall be delivered to the Corporation and/or the Other Shareholder, a stock certificate or certificates representing the Shares being purchased and sold, duly endorsed in blank for transfer with all applicable documentary and transfer tax stamps attached, paid or otherwise provided for by the seller of such Shares. The Corporation and/or the Other Shareholder shall pay the purchase price for such Shares in the manner provided in Section 4 above.

6.    Right to Participate in Sale of Shares to Third Party;
      Right to Require Sale of Shares to Third Party

6.1.    Right and Obligation to Participate.

6.1.    If a third party shall offer to purchase more than 50% of the outstanding Shares of the Corporation from the Other Shareholder and/or any other holder of outstanding Shares (collectively, the "Participating Shareholders"), on arm's length terms acceptable to the Participating Shareholders, then the Other Shareholder or the Corporation shall promptly send notice thereof (which notice shall be sent at least fifteen (15) days prior to any sale of such shares to said third party) to the Executive Shareholder, and the Executive Shareholder shall have the right to participate in such transaction on a pari passu basis (i.e., Executive Shareholder shall have the right to sell to said third party such percentage of his

Shares as shall be equal to the percentage of the total number of outstanding Shares desired to be acquired by said third party) by giving notice of the exercise of such right to the Other Shareholder or to the Corporation within 10 days of the delivery to the Executive Shareholder of the notice of the third party offer (the "Response Period"). If the Executive Shareholder shall fail to so exercise such right, then, provided that the Participating Shareholders are holders of more than 50% of the outstanding Shares of the Corporation, the Other Shareholder or the Corporation shall have the right to require the Executive Shareholder, and the Executive Shareholder shall be obligated, to sell to such third party such percentage of his Shares as shall be equal to the percentage of the total number of outstanding Shares desired to be acquired by said third party. By way of example and not in limitation of the foregoing, if a third party shall offer to purchase 80% of the outstanding Shares, the Executive Shareholder shall have the right to participate in the transaction by selling 80% of his Shares. If, however, the Executive Shareholder declines to participate, then, provided that the Participating Shareholders are holders of more than 50% of the outstanding Shares of the Corporation, the Other Shareholder or the Corporation shall have the right to require the Executive Shareholder, and the Executive Shareholder shall be obligated, to sell to such third party up to 80% of his Shares.

6.2.     Terms of Sale.   If the rights of the Executive Shareholder, the Other Shareholder, and/or any other shareholders or the Corporation under Section 6.1 above shall be exercised by any of them, the consideration per share payable to the Executive Shareholder with respect to the Shares covered by such exercise shall be identical in amount and payment terms to the consideration per share paid to the selling Shareholders by the third party, and the Executive Shareholder shall join in all representations, warranties covenants and indemnities made by the selling Shareholders, provided, however, that the liability of the Executive Shareholder pursuant to said sale shall not exceed his proceeds therefrom. In connection with such sale, the Executive Shareholder shall cause the stock certificate or certificates representing the Shares covered by such exercise to be delivered to said third party,

duly endorsed in blank for transfer with all applicable documentary and transfer tax stamps attached, paid or otherwise provided for by the Executive Shareholder.  All notices sent under this Section 6 shall comply with the provisions of Section 9 below.

6.3.      To the extent the provisions of this Section 6 shall conflict or be inconsistent with any of the provisions of Section 2 or 3 above, this Section 6 shall have priority over and supersede the provisions of Sections 2 and 3.

7.    Attorney's Representations.

The parties all acknowledge that Corporation's counsel, Gibney, Anthony & Flaherty, LLP ("GA&F"), prepared this Agreement on behalf of and in the course of this attorney's representation of Corporation, and that:

(1)      THE PARTIES HAVE BEEN ADVISED BY GA&F THAT A CONFLICT EXISTS AMONG THEIR INDIVIDUAL INTERESTS; AND

(2)      THE PARTIES HAVE BEEN ADVISED BY GA&F TO SEEK THE ADVICE OF INDEPENDENT COUNSEL; AND

(3)      THE PARTIES HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT COUNSEL; AND

(4)      THE PARTIES HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT TAX COUNSEL.

8.    Reserved.

9.    Notices. All notices which are provided for under any provisions of this Agreement shall be in writing and shall be delivered by hand or sent by overnight air courier or by certified or registered mail, return receipt requested.  Any such notice, if sent by hand or by overnight air courier, shall be deemed to have been delivered upon receipt, or, if sent by mail, shall be deemed to have been sent on and as of the date when the same was deposited for mailing

properly addressed with postage prepaid in a United States post office or post office mailbox, and shall be deemed to have been delivered on the date of receipt appearing on the return receipt requested or, if refused, on the date of refusal.  All notices provided to be sent or delivered to the Executive Shareholder shall be addressed to the Executive Shareholder at his address appearing on the record of Shareholders of the Corporation.  All notices provided to be sent or delivered to the Corporation shall be addressed to it at its principal executive offices to the attention of the President with a copy to Gibney, Anthony & Flaherty, LLP, 665 Fifth Avenue, New York, NY 10022. Attention: Melvyn H. Halper, Esq.

> 10.  Termination of Certain Rights.

The right of first refusal provided in Section 2 hereof, the call rights provided in Section 3 hereof and the right to participate in the sale of Shares provided in Section 6 hereof shall automatically terminate on the occurrence of any of the following events:  (i) the cessation of the Corporation's business or the liquidation of the Corporation, (ii) whenever one holder owns all and Shares of the Corporation or (iii) the time that a Registration Statement with respect to an underwritten public offering of the Corporation's Shares is declared effective by the Securities and Exchange Commission;  provided, however, that if such underwritten public offering is not consummated, at such time as the applicable Registration Statement is withdrawn the termination provided in this Section 10 shall be void and such rights shall be reinstated and in force as if such termination had not occurred.

> 11.  Miscellaneous.

11.1.    The Executive Shareholder agrees that the certificates representing Shares held by him shall have stamped or printed thereon the restrictive legends set forth on Schedule C to this Agreement.

-10-

11.2.    The term "Shares" as used herein shall include all Shares issued pursuant hereto; all additional Shares hereafter acquired or issued to the Executive Shareholder and all additional securities issued with respect thereto pursuant to any stock dividend, stock-split, recapitalization, reorganization, merger or consolidation.

11.3.    The Executive Shareholder represents and warrants that he is acquiring the Shares solely for his own account for investment and not with a view to or for sale in connection with any distribution thereof. Executive Shareholder agrees that he will not, directly or indirectly, offer, transfer, sell or otherwise dispose of any of such Shares (or solicit any offers to buy, purchase or otherwise acquire any of such Shares) except in compliance with the Securities Act of 1933, as amended (the "Act") and the rules and regulations thereunder. Executive Shareholder further understands, acknowledges and agrees that none of such Shares may be transferred, sold or otherwise disposed of unless (i) such disposition is pursuant to an effective registration statement under the Act,  (ii) the Executive Shareholder shall, if requested by the Corporation, have delivered to the Corporation an opinion of counsel reasonably satisfactory to the Corporation to the effect that such disposition is exempt from the provisions of Section 4 of the Act or (iii) a no-action letter from the Securities and Exchange Commission shall have been obtained with respect to such disposition.

11.4.    This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, legal representatives, successors and/or assigns, including permitted transferees of Shares originally owned by the Executive Shareholder.

11.5.    This Agreement may be executed in several counterparts, each of which shall be deemed an original.

-11-

11.6.    This Agreement shall be construed in accordance with and governed by the internal substantive laws of the State of Florida and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof.

11.7.    None of the terms or conditions of this Agreement may be changed, modified, waived or cancelled except by a writing signed by all parties hereto specifying such change, modification, waiver or cancellation.   A waiver at any time of compliance with any terms or conditions of this Agreement shall not be considered a modification, cancellation or waiver of such terms or conditions, or of any preceding or succeeding breach thereof, unless expressly so stated.

[SIGNATURE PAGE FOLLOWS]

12

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

SEMINOLE   CASUALTY   INSURANCE COMPANY

By: _Joseph Scaturro Pre_

OTHER SHAREHOLDER

_[signature]_

Carl Seaman

EXECUTIVE SHAREHOLDER

_[signature]_

Joseph Scaturro

<u>SCHEDULE A</u>

<u>Promissory Note</u>

Dated As of January 2, 2004

$156,000

Plantation, Florida

FOR VALUE RECEIVED, the undersigned Joseph Scaturro, with an address at 888 NW 115 Avenue, Plantation, Florida 33325 ("Maker"), hereby promises to pay to the order of Carl Seaman, with an office c/o Carl & Associates, 250 Park Avenue, 20th Floor, New York, NY 10017, the principal sum of ONE HUNDRED FIFTY-SIX THOUSAND DOLLARS ($156,000), with interest thereon, until the said principal sum shall be fully paid. Payments are to be made as follows:

Annual payments of principal in the amount of $52,000 commencing January 2, 2005 and continuing on the 2nd day of January of each year thereafter through and including January 2, 2007 (the "Maturity Date"), when, unless sooner paid, the remaining principal and all accrued and unpaid interest shall be due and payable in full. Maker may prepay this Note at any time, in whole or in part, with payment of all interest accrued upon the amount of the prepayment, and there shall be no prepayment fees or penalties.

On each payment date set forth above, the Maker shall pay interest on the unpaid principal amount from time to time outstanding until payment in full at a floating rate equal to the short term Applicable Federal Rate (AFR) for December as determined and published by the Internal Revenue Service. For the period of the date of this note until the first anniversary, the interest rate shall be that published by the Internal Revenue Service for December, 2003, (1.84% per annum) in Revenue Ruling 2002-81.

Maker and each endorser of this Note separately waive presentment, demand for payment, notice of dishonor, notice of protest and all other notices or demands in connection with the delivery, acceptance, performance, default, endorsement or guarantee of this Note and expressly agree that this Note or any payment hereunder may be extended from time to time by the holder of this Note without in any way affecting the liability of Maker hereunder.

This Note shall be governed by and construed in accordance with the laws of the State of Florida.

Joseph Scaturro

Joseph Scaturro

## SCHEDULE B

The price per share shall be a mutually agreed value as of the date of exercise of the call or the date of such other applicable occurrence (the "Exercise Date"). If the parties are unable to agree on the price per share within 10 days of the Exercise Date, the parties shall mutually select an independent appraiser to determine a fair price per share. If the parties are unable to agree upon an independent appraiser within 20 days following the Exercise Date, then each party shall select an appraiser and notify the other of the appraiser's name and address within 30 days of the Exercise Date. The two appraisers shall make independent determinations as to the price per share as soon as practicable. The price per share shall be the average of the two price determinations. Each party shall pay the fee charged for that party's appraiser. If the parties agree to use a mutually selected independent appraiser, the fee charged by that appraiser shall be borne equally by each party.

Notwithstanding the foregoing, the price per shall as of the Exercise Date shall be (i) $.65 per share if during the period beginning on the date of this Agreement and ending January 1, 2008, the Executive Shareholder voluntarily terminates his employment or his employment is involuntarily terminated by the Corporation for any reason.

## SCHEDULE C

The Shares represented by this Certificate are issued, accepted and held subject to the terms of an Agreement among certain shareholders of the Corporation dated as of January 2, 2004. A copy of such agreement has been duly filed with the Secretary of the Corporation, and neither this certificate nor the stock represented hereby is subject to sale, assignment, transfer, mortgage, pledge, hypothecation or other disposition or encumbrance, except as provided in said agreement and subject to said agreement, and to which agreement the holder hereof consent by the acceptance of this certificate.

The shares evidenced by this certificate have not been registered under the Securities Act of 1933, as amended. The shares have been acquired without a view to distribution and may not be pledged or hypothecated, and may not be sold or transferred in the absence of an effective Registration Statement for the shares under the Securities Act of 1933, as amended, or an opinion of counsel to the Company or determination by its Board of Directors that registration is not required under said Act.

℔JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

JOSEPH J. SCATURRO

**CIV - HUCK**

## DEFENDANTS

SEMINOLE CASUALTY INSURANCE COMPANY; and CARL N. SEAMAN

**(b)** County of Residence of First Listed Plaintiff  **BROWARD**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  **BROWARD**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Malman, Malman and Rosenthal
3107 Stirling Road, Suite 101
Fort Lauderdale, FL 33312-8500
Telephone: 954-322-0065

**MAGISTRATE JUDGE SIMONTON**

Attorneys (If Known)

**07 - 61072**

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☑ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☑ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

*0:07CV 61072-Huck Common*

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

*FILED by INTAKE*  *D.C.*

**AUG - 1 2007**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. LAUD.

## V. ORIGIN  (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO     b) Related Cases ☐ YES ☑ NO

JUDGE _____   DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

Securities fraud claims under Section 10(b) of the Exchange Act (15 USC S 78j(b)) and Rule 10b-5 thereunder, and related state law causes of action for fraud, breach of fiduciary duty, breach of contract and so forth.
LENGTH OF TRIAL via  8-12  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE  7/31/07

FOR OFFICE USE ONLY

AMOUNT  350.00     RECEIPT # _____     IFP _____

**540597**