UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.  07-61072-CIV-HUCK/SIMONTON

JOSEPH J. SCATURRO,

    Plaintiff,

vs.

SEMINOLE CASUALTY INSURANCE
COMPANY, CARL N. SEAMAN,
CARL & ASSOCIATES, LLC,
METLIN MARKETING COMPANY, LLC,
and METLIN HOLDING COMPANY, LLC,

    Defendants.
_____/

**ORDER GRANTING MOTIONS TO DISMISS COUNT ONE
OF THE AMENDED COMPLAINT ALLEGING SECTION 10(B) SECURITIES FRAUD**

      THIS CAUSE is before the Court upon Defendant Carl Seaman's Motion to Dismiss the Amended Complaint, filed October 1, 2007 [D.E. #10], and the remaining Defendants' Motion to Dismiss the Amended Complaint, filed October 12, 2007 [D.E. #15].  This Order will address those Motions only insofar as they seek to dismiss Count One of the Amended Complaint, which alleges a securities fraud claim under section 10(b) of the Securities Exchange Act of 1934 ("SEA").  The remainder of the Motions, which seek to dismiss Plaintiff's state law claims, will be addressed at a later date if Plaintiff's federal claim survives and the Court retains jurisdiction over the rest of the Amended Complaint.

      In their Motions to Dismiss, Defendants argue that Plaintiff's securities fraud claim is deficient because it fails to satisfy several pleading requirements, namely: pleading facts sufficient for the transaction at issue to come within the scope of the SEA, pleading a material misrepresentation or omission in connection with the sale of a security, pleading scienter, and pleading loss causation. The Court has reviewed the Motions, Plaintiffs' Responses, Defendants' Replies, the Amended Complaint, and all pertinent parts of the record.

## I. FACTUAL ALLEGATIONS

Accepting all well-pled facts in the Amended Complaint as true, the Court assumes the following facts.[1] Plaintiff Joseph Scaturro resides in Broward County, Florida and is one of two shareholders of Seminole Casualty Insurance Company's ("Seminole") outstanding stock, owning 20%. Between May 7, 2002 and about May 14, 2007 Plaintiff was employed by Seminole, a corporation in the business of writing insurance policies with its principal place of business in Florida. Plaintiff most recently served as Seminole's President, and also as a member of the company's Board of Directors. Carl Seaman ("Seaman") resides in Fairfield County, Connecticut and serves as the Chairman of Seminole's Board of Directors. Seaman is also the majority shareholder of Seminole's outstanding stock, owning 80%.

During his tenure at Seminole Plaintiff suffered from a visual impairment making it difficult for him to read, and often requiring him to seek the assistance of others to read and explain written materials. Seaman and other Seminole directors, officers, and employees were aware of Plaintiff's visual impairment and routinely assisted him in reading written materials.

Prior to May 2002 Seminole was unprofitable and under-reserved. In May 2002 Seaman, as Chairman of Seminole's Board and the company's sole shareholder at the time, recruited Plaintiff to manage Seminole's Florida operations and to increase the company's profitability and share value. Seaman orally offered Plaintiff an annual base salary of $160,000, an annual bonus calculated at 30% of the amount by which Plaintiff reduced Seminole's expenses, and continuous employment until Plaintiff (then 58 years old) either retired or Seminole was sold, provided that Plaintiff was successful in turning the company around. Plaintiff accepted employment on these terms.

By 2003 Plaintiff had significantly reduced Seminole's expenses and was thus entitled to a bonus of approximately $600,000. When Plaintiff asked Seaman for payment, Seaman refused. In lieu of a bonus, Seaman urged Plaintiff to purchase stock in Seminole. Plaintiff was reluctant to do this, as Seminole was unprofitable at that time. Seaman told Plaintiff that instead of paying cash,

---

[1] The Court recites only those portions of the factual background relevant to this Order on Defendants' Motions to Dismiss Plaintiff's securities fraud claim. The Court draws these facts from the Amended Complaint because, at the motion to dismiss stage, the Court accepts all well-pled facts as true and construes all reasonable inferences therefrom in the light most favorable to the plaintiff. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1198 n.2 (11th Cir. 2001) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999)).

he could apply his $600,000 bonus to the purchase of the stock. Plaintiff could also, Seaman said, receive bonuses for the years 2002, 2003, 2004, 2005 and 2006 and apply them to the stock purchase. Seaman promised Plaintiff that he would receive a substantial return on his investment once Seminole's financial health improved and the company was sold.

Although the chronology is unclear from the Amended Complaint (*see* footnote 2), it appears that Plaintiff relied on Seaman's representations and agreed to forego his $600,000 bonus, and applied portions of bonuses from 2002, 2003, 2004, 2005 and 2006 to pay for shares in Seminole. Seaman retained his cousin Melvyn H. Halper (a real estate attorney practicing in New York) to draft a shareholders' agreement (the "Agreement") and presented this Agreement to Plaintiff at some point in 2004. *See* Am. Compl. Ex. D. Plaintiff requested that Seaman, as both the Chairman of Seminole and its majority shareholder, explain the material terms of the Agreement to him. In response, Seaman stated, "It's what we've talked about. It's the stock that you'll cash out when we sell the company. Trust me, Joe. I love you and your wife, and I'm going to take care of you." On the basis of this representation, Plaintiff executed the Agreement and paid a total of $260,000 for 400,000 shares of Seminole stock, priced at $0.65 per share. Specifically, Plaintiff paid $104,000 in cash and executed a promissory note to Seaman for $156,000, which he repaid through annual payments of $52,000 made in 2005, 2006 and 2007.[2]

Plaintiff alleges he was not aware that there was a conflict of interest between Plaintiff and Seminole and Seaman in the context of the Agreement, that Mr. Halper only represented Seminole and Seaman, and that Plaintiff should have retained separate counsel.[3]

Between May 2002 and early 2007 Plaintiff succeeded in leading Seminole from the verge of insolvency and receivership to profitability, and Seminole is currently expanding into multiple states. Seminole almost tripled its total assets and its total surplus between 2002 and early 2007. Between May 2002 and early 2007 Seaman regularly called Plaintiff in Florida and traveled to

---

[2] The Amended Complaint is unclear as to whether Plaintiff purchased the shares and then signed the Agreement, or signed the Agreement and then purchased the shares. Paragraph 31 states that "*after* Plaintiff had forgone his $600,000.00 bonus and purchased shares in the company," Seaman retained his cousin Mr. Halper to draft the Agreement. (Emphasis added). However, Paragraph 34 states that Plaintiff signed the Agreement and *then* purchased the shares.

[3] However, the Court notes that section 7 of the Agreement states that Plaintiff was advised to retain independent counsel, and had an opportunity to do so. *See* Am. Compl. Ex. D at 9.

Florida every four to six weeks to discuss Seminole's status. During these conversations they also discussed selling Seminole, agreeing that the sale proceeds would be split between them 80/20, according to their respective ownership interests in the company.

On or about May 11, 2007, Seminole terminated Plaintiff's employment without notice or explanation. Plaintiff received a letter from Seaman dated June 20, 2007 in which Seaman sought to exercise his call rights under the Agreement. Seaman enclosed a copy of the Agreement with his letter. This copy of the Agreement contained a separate page labeled "Schedule B," which stated Seaman had the right to call Plaintiff's shares at the price of $0.65 per share if, before January 1, 2008, Plaintiff voluntarily terminated his employment or was involuntarily terminated for any reason. Plaintiff alleges that Seaman never discussed Schedule B with him when he asked Seaman to read him the Agreement. Plaintiff further alleges that when he signed the Agreement he did not know it contained the provisions set forth in Schedule B, and did not become aware of the existence of Schedule B until Seaman's June 20, 2007 letter. Schedule B does not contain a signature or initials to indicate that it was included with the Agreement when the Agreement was originally presented to Plaintiff.[4] If Plaintiff had known he could be forced to sell his shares at the purchase price, he would not have purchased the shares or executed the Agreement.

## II.  PROCEDURAL HISTORY

Plaintiff filed suit in this Court on August 1, 2007 (*see* D.E. #1). Seaman filed suit in Broward County state court on August 10, 2007 seeking payment from Plaintiff on certain promissory notes, at least one of which Plaintiff used to pay for part of the 400,000 shares of Seminole stock he purchased. When Plaintiff submitted his answer in that state case, he also brought a counterclaim seeking the same relief he seeks in this case, except without the federal securities fraud claim (*see* D.E. #11).

On August 17, 2007 Plaintiff filed an Amended Complaint (*see* D.E. #7) bringing the following claims: Count 1, securities fraud under section 10(b) of the SEA against Seminole and Seaman; Count 2, breach of oral employment contract against Seminole; Count 3, breach of implied

---

[4] However, the Court notes that the Agreement makes specific reference to Schedule B in section 3.1. *See* Am. Compl. Ex. D at 4-5. That section outlines Seaman's and Seminole's right to call Plaintiff's shares within six months of his termination, at the price "determined in accordance with Schedule B attached."

covenant of good faith and fair dealing against Seminole; Count 4, breach of fiduciary duty against Seaman; Count 5, fraudulent inducement against Seminole and Seaman; Count 6, dissolution against Seminole; Count 7, attorneys fees against Seminole; Count 8, dissolution against Metlin Marketing Company and Metlin Holding Company; Count 9, breach of fiduciary duty against Carl & Associates; and Count 10 (mistakenly labeled as a duplicate Count 9), tortious interference with advantageous business relationships against Seaman.  Plaintiff bases federal jurisdiction on Count 1, the securities fraud claim.  Plaintiff alleges his securities fraud claim provides supplemental jurisdiction over the state claims in the remainder of his Amended Complaint under 28 U.S.C. § 1367(a).  *See* Am. Compl. at ¶ 7.

On October 1, 2007 Seaman filed a motion to dismiss the counts against him in the Amended Complaint, which is now fully briefed and ripe for resolution.  On October 12, 2007 the remaining Defendants moved to dismiss the counts against them in the Amended Complaint, which is also fully briefed and ripe for resolution.  However, as explained above, in this Order the Court will only address those portions of the Motions pertaining to the federal securities fraud claim in Count One.

### III.  MOTION TO DISMISS STANDARD

In reviewing a motion to dismiss, all well-pled facts in the plaintiff's complaint and all reasonable inferences drawn from those facts must be taken as true.  *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1534 (11th Cir. 1994).  Federal Rule of Civil Procedure 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Specific facts are generally not necessary; the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 335 U.S. 41, 47 (1957)).  In this regard, however, a plaintiff must offer "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 1965.  Dismissal is warranted under Rule 12(b)(6) if, assuming the truth of the factual allegations in the plaintiff's complaint, there is a dispositive legal issue which precludes relief.  *See, e.g.*, *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

### III.  ANALYSIS

In Count I of his Amended Complaint, Plaintiff alleges that Seaman and Seminole violated section 10(b) of the SEA and rule 10b-5 promulgated thereunder.  Section 10(b) of the SEA provides, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (2000).  Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2000).  Further, in order to state a claim under section 10(b) and rule 10b-5, a plaintiff must allege 1) material misrepresentation or omission, 2) scienter, 3) connection with the purchase or sale of a security, 4) reliance, 5) economic loss, and 6) causal connection between the material misrepresentation and loss.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

A.      **Pleading Purchase or Sale of a Security Giving Rise to a Section 10(b) Violation**

All Defendants moved to dismiss Plaintiff's securities fraud claim, arguing that Plaintiff fails to allege fraud in connection with a transaction protected by section 10(b). *See* D.E. #10 at 8-10; D.E. #16 at 4-6. Defendants' two main arguments in this vein are discussed below.

1.      **Whether Plaintiff pleads fraud in connection with a "security" as contemplated by the SEA**

"[T]o reach the question of an alleged violation of the anti-fraud provisions of the Securities Acts, the transaction at issue must involve a 'security' as defined in [the] 1934 Act[ ]." *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1285 (11th Cir. 2007) (quoting *Home Guar. Ins. Corp. v. Third Fin. Servs., Inc.*, 667 F. Supp. 577, 579 (M.D. Tenn. 1987)) (alterations in original). In their Motions and replies in support thereof, Defendants argue that Plaintiff fails to plead fraud in connection with a "security" as contemplated by the SEA, because the shares of Seminole stock at issue do not meet the definition of a "security" under that Act.

The definition of "securities" covered by the SEA is broad and includes, among many others, notes, stocks, bonds, and investment contracts. *See* 15 U.S.C. § 78c(a)(10). In *United Housing Foundation, Inc. v. Forman*, the Supreme Court listed the usual characteristics of "stock" in this context: the right to receive dividends contingent upon an apportionment of profits, the ability to be negotiated, the ability to be pledged or hypothecated, the conference of voting rights in proportion to the number of shares owned, and appreciation in value. 421 U.S. 837, 851 (1975). The Court confirmed this approach in *Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985). As the *Landreth* Court noted, *Forman* recognized that when an instrument is both called "stock" and bears the usual characteristics of stock, a purchaser may justifiably assume that federal securities laws apply. *Id.* at 686.[5] Courts need not look beyond these usual characteristics of stock to the "economic reality" of the transaction at issue unless it does not fit squarely within one of the specific kinds of securities listed in 15 U.S.C. § 78c(a)(10). *Id.* at 690 n.4.

---

[5] *See also Reves v. Ernst & Young*, 494 U.S. 56, 62 (1990) (noting *Landreth* recognizes "that stock is, as a practical matter, always an investment if it has the economic characteristics traditionally associated with stock. Even if sparse exceptions to this generalization can be found, the public perception of common stock as the paradigm of a security suggests that stock, in whatever context it is sold, should be treated as within the ambit of the [Securities Acts of 1933 and 1934].").

Here, Plaintiff has sufficiently alleged that he purchased "stock" in Seminole within the meaning of the SEA.  This is because the shares Plaintiff purchased were called "common stock" in the Agreement, and also because Plaintiff pleads those shares bear many of the usual characteristics of stock.  *See* Am. Compl. Ex. D at 1; *Forman*, 421 U.S. at 686.  For example, the Agreement contemplates the issuance of dividends in the form of "stock dividends."  Am. Compl. Ex. D at 1.  Plaintiff also alleges that Seaman controlled Seminole in part through his "controlling ownership interest in the company."  *Id.* at ¶ 14.  This suggests Seaman had voting rights or some form of control in proportion to the numbers of Seminole shares he owned.  Plaintiff further pleads that, in being forced to sell his shares at the price he paid for them, or $0.65 per share, he failed to obtain "fair market value" for his shares (*id.* at ¶ 66), and also that he was hired by Seaman in part to "increase" Seminole's "share value" (*id.* at ¶ 17).  These allegations indicate that Seminole shares had the potential to appreciate in value.  Importantly, the Agreement also explicitly contemplates the application of federal securities law.  *Id.* Ex. D at 11.

Defendants argue that because the Agreement limited Plaintiff's ability to transfer, pledge, and hypothecate his Seminole shares, those shares are not "stock" within the meaning of the SEA.  *See id.* at 2-4, 7-9, 11.  However, given that the Agreement specifically referred to the shares Plaintiff purchased as "common stock," that the Agreement explicitly contemplated the application of federal securities laws, and that Plaintiff pled his Seminole shares met the other usual characteristics of a "stock," the Court finds Plaintiff has sufficiently alleged his purchase of Seminole shares fell within the SEA.  The Court finds *Sulkow v. Crosstown Apparel Inc.* instructive in this regard.  807 F.2d 33 (2d Cir. 1986).  There, the court stated that "[t]he fact that [the company whose shares were at issue] was a close corporation, with the Shareholders' Agreement envisioning some limitations on the stock's negotiability and pledgeability, is insufficient to negate the character of the stock as a security."  *Id.* at 37.  Indeed, the court stated, "[l]imitations on the transfer of stock in close corporations are common, but neither the small size of the corporation nor the restrictions on transferability remove such a corporation's stock from the reach of Rule 10b-5."  *Id.*  "[T]he [1934 Act] has always been understood to apply to transactions in shares of close . . . corporations, even though frequently there are some restrictions on the transfer of the stock of such corporations."  *Id.*

8

(internal quotations and citations omitted).[6]  In sum, the Court finds Plaintiff has sufficiently pled that his section 10(b) claim involves a "security" within the meaning of the SEA.

### 2. Whether Plaintiff pleads the required nexus with interstate commerce

In arguing that section 10(b) does not apply to the facts of this case, Defendants also emphasize that Plaintiff's securities fraud claim involves a "private" and "closely-held" company with only two shareholders.  By the language of the SEA and rule 10b-5, these factors are not dispositive in assessing section 10(b) coverage.  What *is* dispositive in determining whether section 10(b) and rule 10b-5 apply is a nexus with interstate commerce.  Indeed, for a securities fraud claim under section 10(b) and rule 10b-5, "[f]ederal jurisdiction depends on the 'use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange.'" *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 93 (5th Cir. 1975) (quoting 15 U.S.C. § 78j).[7]

Here, as Defendants point out, there is no contention that Seminole or Seaman used a national securities exchange to perpetrate the alleged securities fraud – the securities at issue pertain to a closely held, private corporation that does not publicly trade its stock.  Further, Plaintiff failed to allege Seminole and Seaman used any means or instrumentality of interstate commerce or of the mails.  Indeed, in Plaintiff's Response to one of the motions to dismiss, Plaintiff lists the allegations on which he bases his securities fraud claim.  *See* D.E. #24 at 3-5.  No allegations on those pages, or anywhere else in the Amended Complaint, appear to provide the required nexus between the

---

[6] Defendants also argue that Plaintiff did not purchase a "security" within the meaning of the SEA when he purchased Seminole shares because he did not intend to "profit through the efforts of others," citing to *Forman*. D.E. #16 at 5.  The *Forman* Court derived the test of whether a transaction involved "an investment of money in a common enterprise with profits to come solely from the efforts of others" from *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).  However, the Court in *Landreth* limited the application of the *Howey* test, making clear that it is used only to determine whether a transaction constitutes an "investment contract" – not to determine whether a transaction is a "security" generally under the SEA. *Landreth*, 471 U.S. at 691-92.

[7] *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) ("We hold that the decisions of the United States Court of Appeals for the Fifth Circuit . . . as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit . . . .").

alleged securities fraud and interstate commerce. Thus, Plaintiff fails to plead the interstate nexus required to bring his claim within the SEA.

**B.      Pleading Fraud with Particularity under Rule 9(b) and PSLRA**

Plaintiff's section 10(b) claim is also deficient because he fails to plead material misrepresentations or omissions with the required level of particularity. In stating a proper section 10(b) claim plaintiffs must satisfy the requirements of Federal Rule of Civil Procedure 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." In this Circuit, "Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (internal quotation marks and citations omitted).

Section 10(b) plaintiffs must also comply with the requirements of the Private Securities Litigation Reform Act ("PSLRA"), which provides that "[i]n any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading," the complaint must "(1) specify each statement alleged to have been made, (2) the reason or reasons why the statement is misleading, and (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C.A. § 78u-4(b)(1). The PSLRA was enacted in 1995 to insure the disposition of baseless claims before a defendant is forced to engage in expensive, protracted discovery. *Rhodes v. Omega Research, Inc.*, 38 F. Supp. 2d 1353, 1358 (S.D. Fla. 1999).

In their Motions to Dismiss, Defendants argue that Plaintiff has failed to plead sufficiently particularized facts to state a proper section 10(b) claim. In support of his section 10(b) claim, Plaintiff alleges he was "recruited" to work for Seminole in May 2002 and that as "compensation" for his work at Seminole he would receive, among other things, "continuous ongoing employment until Plaintiff, who, at the time, was 58 years old, either retired or the company was sold, provided

that Plaintiff was successful in turning the company around." Am. Compl. at ¶ 18. Plaintiff alleges that Seaman "misrepresent[ed] to Plaintiff that Plaintiff would be employed by . . . Seminole until he retired or the company was sold, when Defendant Seaman knew that he would terminate Plaintiff prior to January 1, 2008 to seek to force the sale of Plaintiff's shares for far less than their fair market value." *Id.* at ¶ 61. However, Plaintiff does not plead any particulars of Seaman's representation that Plaintiff would be employed until he retired or Seminole was sold, except to say that Seaman told Plaintiff this in 2002. Some factual allegations appear to be missing here – it strains credulity to think that, in 2002, Seaman knew he would terminate Plaintiff prior to January 1, 2008 to take advantage of a call provision in an agreement that was not drafted and signed until 2004.

Plaintiff also alleges that Seaman urged him to purchase Seminole stock in lieu of receiving a bonus amounting to $600,000 and "promised Plaintiff that he would receive a substantial return on his investment once . . . Seminole was successfully turned around and sold." *Id.* at ¶¶ 23-28. Again, Plaintiff does not allege exactly what Seaman said to communicate this promise, nor the "time and place" of such statements. Plaintiff alleges that Seaman and he discussed "selling . . . Seminole, agreeing that the sale proceeds would be split between them 80/20, according to their respective ownership interests in the company." *Id.* at ¶ 41. Plaintiff alleges Seaman made these representations despite knowing "that he would terminate Plaintiff prior to January 1, 2008 to seek to force the sale of Plaintiff's shares for far less than their fair market value and thereby preclude Plaintiff from sharing in the potentially substantial proceeds of the company's sale." *Id.* at ¶ 61. Plaintiff alleges vaguely that these "conversations" occurred "regularly" between May 2002 and early 2007, with no specifics as to exactly when they spoke, where they spoke, and what "precisely" was said, as required by Rule 9(b). *Id.* at ¶¶ 40-41.

As further support for his section 10(b) claim, Plaintiff alleges that Seaman "specifically misrepresent[ed] the content of the Shareholders' Agreement." *Id.* at ¶ 61. Plaintiff alleges that when he asked Seaman to explain the contents of the Agreement to him, Seaman replied, "It's what we've talked about. It's the stock that you'll cash out when we sell the company." *Id.* It is far from clear how Seaman's statement is a material misrepresentation. While Plaintiff alleges Seaman's statement was "consistent with their previous oral agreements about the stock," Plaintiff did not plead any specifics about these "previous oral agreements" such as when Seaman made them, where, and what exactly he said. *Id.* at ¶ 34. Without such specifics, Seaman's statement appears to be

11

merely a broad summary of the Agreement's nature, not a material misrepresentation as to its specific terms. According to Plaintiff's facts, Plaintiff executed the Agreement "[i]n reliance" on Seaman's statement alone. It appears that Plaintiff did not read the text, have someone else read it to him, or otherwise make himself aware of the specific terms of the Agreement, which included a provision allowing Seminole and Seaman to call Plaintiff's shares if he left the company voluntarily or was terminated for any reason. Plaintiff pleads that his visual impairment makes it very difficult for him to read, but nevertheless it appears he *signed* the Agreement without making himself aware of its contents, relying instead on Seaman's vague statement that the Agreement contained "what they had talked about." Because it is unclear how Seaman's statement amounted to a material misrepresentation in connection with the sale of Seminole's stock, Plaintiff's allegations regarding this statement fail to satisfy the pleading requirements of section 10(b) and rule 10b-5.

Plaintiff makes several other allegations concerning the Agreement which likewise fail to satisfy the applicable pleading requirements. Specifically, Plaintiff alleges that he was not aware of the conflict of interest between himself and Seaman and Seminole, and that he was not advised to seek outside counsel to represent him in negotiating the Agreement. However, the Agreement itself contains the following statements: that the parties to the Agreement had been advised of the conflict between their individual interests, that they had been advised to seek independent counsel, and that they had the opportunity to seek such counsel. *Id.* Ex. D at 9. Moreover, the Agreement specifically states that the parties thereto "all acknowledge that Corporation's counsel, Gibney, Anthony & Flaherty, LLP . . . prepared this Agreement on behalf of and in the course of this attorney's representation of Corporation . . . ." *Id.* While Plaintiff now claims he was not given such advice, he *signed* the Agreement, which he attached to his Amended Complaint, stating that he was provided such advice. The Court's "duty to accept the facts in the complaint as true does not require [it] to ignore specific factual details of the pleading in favor of general or conclusory allegations. Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007).

Further, Plaintiff claims he was not aware of "Schedule B" of the Agreement, which stated Seaman had the right to call Plaintiff's shares at $0.65 per share if, before January 1, 2008, Plaintiff voluntarily terminated his employment with Seminole or was involuntarily terminated for any reason. However, in section 3.1 the Agreement explicitly states that the call terms and price will be

governed by "Schedule B attached." *Id.*; Am. Compl. Ex. D. at 4-5. Plaintiff alleges that "Schedule B does not contain a signature or initials to indicate that it was included with the Agreement when the Agreement was originally presented to Plaintiff." *Id.* at ¶ 46. If Plaintiff intends to represent that Schedule B reads differently now than when he signed the Agreement, or that his consent to be bound by the Agreement and/or Schedule B was otherwise fraudulently procured (rather than he simply did not make himself aware of Schedule B's contents when he signed the Agreement), he should make such allegations with the particularity required by Rule 9(b) and the PSLRA.[8]

In sum, Plaintiff fails to properly plead what material misrepresentations or omissions Seaman and Seminole allegedly made in connection with the sale of Seminole stock.

## C.    Scienter

The requirement that a Section 10(b) plaintiff allege scienter – or "intent to deceive, manipulate or defraud" – is well established. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The PSLRA provides that plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" in alleging a section 10(b) claim. 15 U.S.C. § 78u-4(b)(2).

The Eleventh Circuit has rejected the simple pleading of motive and opportunity as fulfilling the requirement that plaintiffs allege facts giving rise to a strong inference of fraudulent intent. *See Bryant v. Avado Brands*, 187 F.3d at 1285. Plaintiffs must plead particularized facts to show scienter, although these particular facts may be aggregated to infer scienter. *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004).

The U.S. Supreme Court recently gave this guidance to courts determining whether a plaintiff has alleged facts giving rise to such a "strong inference":

> a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences . . . . Yet the inference of scienter must

---

[8] In arguing that his section 10(b) claim is adequately pled, Plaintiff relies on *Boim v. National Data Products., Inc.*, 932 F. Supp. 1402 (M.D. Fla. 1996) and *Brown v. Ivie*, 661 F.2d 62 (5th Cir. 1981). However, neither of these cases contains any discussion of the plaintiffs' specific allegations or any analysis of the applicable pleading requirements. Moreover, because *Brown v. Ivie* was decided on November 12, 1981, that decision was not adopted by *Bonner* and thus is not binding on this Court. *See* Footnote 7.

> be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs, Inc. v. Makor Issues & Rights*, *Ltd.*, 127 S. Ct. 2499, 2510 (2007) (internal quotations and citations omitted).

Here, Defendants contend that Plaintiff fails to adequately plead scienter, pointing out that merely alleging motive – terminating Plaintiff prior to January 1, 2008 in order to call his shares at $0.65 per share – and opportunity to do so is insufficient to provide a strong inference of fraudulent intent. The Court agrees, and finds that Plaintiff fails to adequately plead scienter in his section 10(b) claim. Based on Plaintiff's facts, the Court finds that Plaintiff has done no more than plead Seaman and Seminole had motive and opportunity to call Plaintiff's shares at the purchase price.

This case is unlike *Boim*, 932 F. Supp. 1402 and *Brown v. Ivie*, 661 F.2d 62, which Plaintiff cites in support of his claim. In those cases, the defendants misrepresented the circumstances or the purpose of the agreements under which the plaintiffs purchased stock or surrendered certain stock rights. Here, by contrast, based on Plaintiff's vague allegations, it appears that neither Seaman or Seminole misrepresented the purpose or content of the Agreement. The facts in Plaintiff's Amended Complaint do not give rise to a "strong inference" that Seminole and Seaman did anything other than terminate an employee and exercise a contractual right to which Plaintiff assented.[9]

In sum, the Court finds that Plaintiff fails to plead facts giving rise to a "strong inference" of fraudulent intent on the part of Seaman or Seminole.

### D.   Loss Causation

Section 10(b) plaintiffs must adequately allege the traditional elements of causation and loss. *See Dura*, 544 U.S. 336. "To establish loss causation, 'a plaintiff must show that the untruth was in some reasonably direct, or proximate, way responsible for his loss.'" *Cordova v. Lehman Bros., Inc.*, --- F. Supp. 2d ----, 2007 WL 4287729, *13 (S.D. Fla. Dec. 7, 2007) (quoting *Robbins v. Koger*

---

[9] Plaintiff's failure to adequately plead scienter with facts showing a "strong inference" of fraudulent intent is linked to his failure to plead Seaman's and Seminole's alleged material misrepresentations or omissions with particularity. Indeed, where Plaintiff cures one of the defects with properly pled facts, he may well cure the other.

*Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)).  "'If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.'" *Id.*[1]  The policy behind the loss causation requirement is "to protect [investors] against those economic losses that the misrepresentations actually cause." *Dura*, 544 U.S. at 345.  Thus, while a plaintiff who has suffered an economic loss need not plead loss causation with special particularity, he must still provide a defendant with "some indication of the loss and the causal connection" between the defendant's conduct and that loss. *Id.* at 347.

In his Motion to Dismiss, Seaman argues that Plaintiff has failed to adequately plead this element of his securities fraud claim.  Construing the pled facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has adequately pled this element of his securities fraud claim.  Plaintiff claims that, had Seaman and Seminole not made their allegedly fraudulent statements and omissions, he would not have agreed to forego bonuses to which he was entitled in exchange for purchasing Seminole shares, bonuses that amounted to more than $1 million. Am. Compl. at ¶¶ 62, 66.  He also pleads that, if not for Seaman's and Seminole's alleged misrepresentations and omissions regarding the nature of the Agreement he signed, he would not have agreed to a call price of $0.65, which meant that he received no return on his investment in the 400,000 shares of Seminole stock. *Id.* at ¶ 48.

In sum, Plaintiff has sufficiently given Defendants "some indication" of his loss, and the causal connection between Defendants' conduct and that loss. *Dura*, 544 U.S. at 347.

---

[1] In *Robbins,* the Eleventh Circuit provided the following standard (unchanged by *Dura*) for proving loss causation:

> To prove loss causation, a plaintiff must show that the untruth was in some reasonably direct, or proximate, way responsible for his loss.  If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.  In other words, loss causation describes the link between the defendant's misconduct and the plaintiff's economic loss.  Because market responses, such as stock downturns, are often the result of many different, complex, and often unknowable factors, the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was "substantial," i.e., a significant contributing cause.

*Robbins*, 116 F. 3d at 1447.

## IV. CONCLUSION

For the reasons stated above, it is hereby ORDERED AND ADJUDGED that the securities fraud claim in Count 1 of the Amended Complaint is DISMISSED WITHOUT PREJUDICE. Plaintiff may replead his securities fraud claim by January 17, 2008 if he can cure the defects discussed above.

DONE AND ORDERED in Chambers, Miami, Florida this January 3, 2008.

_____
Paul C. Huck
United States District Judge

Copies furnished to:
Honorable Andrea M. Simonton
All Counsel of Record